**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

JOHN DOE MC-4,                                                  Case No.

              Plaintiff,                                      Hon.

vs.

THE UNIVERSITY OF MICHIGAN,
THE REGENTS OF THE UNIVERSITY OF
MICHIGAN (official capacity only),

              Jointly and Severally,

              Defendants.

---

Michael A. Cox (P43039)
Jackie J. Cook (P68781)
**THE MIKE COX LAW FIRM, PLLC**
Attorneys for Plaintiff
17430 Laurel Park Dr. N., Ste. 120E
Livonia, MI 48152
734.591.4002
mc@mikecoxlaw.com

David J. Shea (P41399)
Ashley D. Shea (P82471)
**SHEA LAW FIRM PLLC**
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
248.354.0224
david.shea@sadplaw.com

---

**COMPLAINT AND JURY DEMAND**

      NOW COMES Plaintiff, John Doe MC-4, by and through his attorneys, Michael A. Cox,

Jackie Cook and The Mike Cox Law Firm, PLLC, as well as David J. Shea and Shea Law Firm

PLLC, and for his Complaint against the Defendants states as follows:

**I.**     **INTRODUCTION**

      1.     While employed as a physician by the University of Michigan (UM) from 1968

until 2003, Dr. Robert Anderson used his position to repeatedly and regularly sexually assault

1

university students, many of whom were athletes.

2.     Beginning almost immediately in 1968 or 1969, UM received complaints from male students about Dr. Anderson sexually assaulting them during the course of putative medical examinations.

3.     In 1979, UM removed Anderson from his position as University Health Services (UHS) Director after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, and then UM moved Anderson to the position of Athletic Department physician. As physician for the Athletic Department, Anderson continued sexually assaulting male student athletes until he retired in 2003, many of whom were attending on scholarship playing for UM's football, wrestling, and hockey teams.

4.     To UM, the Athletic Department became the perfect place to hide Dr. Anderson's past, present, and future sexual abuse of young men from public disclosure. The fact Dr. Anderson was given free rein to abuse hundreds of male athletes with impunity was, in the end, a calculated risk worth taking by Defendants for the greater good of UM.

5.     Plaintiff was an undergraduate student who received an athletic scholarship to attend UM from 1987 to 1991 and joined the wrestling team in January 1988.

6.     Several times while Plaintiff was an UM student seeking medical care, Anderson sexually assaulted, abused, and molested Plaintiff, by nonconsensual digital anal penetration and excessive genital fondling and manipulation under the guise of medical treatment.

7.     UM is responsible for Plaintiff's damages stemming from Anderson's sexual assaults on UM's campus, as UM placed vulnerable student athletes, like Plaintiff, in Anderson's care despite knowing he was a sexual predator.

8.     This is a civil action against UM for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of

UM and The Regents of the University of Michigan (Regents) (collectively the Defendants) in their official capacity, and their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Anderson against Plaintiff while a UM student.

9.      Plaintiff files this case anonymously because of the extremely sensitive nature of the case as Plaintiff was a victim of sexual assault, and the suit will require disclosure of information "of the utmost intimacy"; Plaintiff is therefore entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 560 (CA 6, 2004), citing *Doe v. Stegall,* 653 F.2d 180, 185–86 (CA 5,1981).

## II.      JURISDICTION AND VENUE

10.      Subject matter jurisdiction is founded upon 28 U.S.C. §1331 which gives district courts jurisdiction of all civil actions arising under the Constitution, laws and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

11.      Subject matter jurisdiction is also founded upon 28 U.S.C. §1343 which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

12.      Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. §1367(a) to hear and decide claims arising under state law that are so related to the claims

within the original jurisdiction of this Court that they form part of the same case or controversy.

13.     The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. §1681 *et seq*., and under Michigan Law.

14.     The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

15.     The events giving rise to this lawsuit occurred in Washtenaw County, Michigan which sits in the Southern Division of the Eastern District of Michigan.

16.     Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. §1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

17.     Plaintiff's Complaint is timely filed within the applicable statutes of limitations and under M.C.L. § 600.6431(3).

## III.   <u>PARTIES</u>

18.     Plaintiff is a resident of the State of Michigan.

19.     UM is a public university organized and existing under the laws of the State of Michigan.

20.     UM receives federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a).

21.     The Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

## IV.   <u>COMMON FACTUAL ALLEGATIONS</u>

22.     From 1968 until 2003, Anderson was a physician employed by UM treating students on UM's Ann Arbor campus, during which time UM gave Anderson unfettered access to young college students, including young male athletes.

23.     In 1968, Anderson started as the University Health Service (UHS) Director as well

4

as UM football team physician.

24.     **UM was warned in 1968 by an undergraduate student that Anderson was a sexual predator**. In 1968 or 1969, a gay UM student, Gary Bailey, went for an examination by Anderson, an examination that Mr. Bailey later described to the Detroit News as "very traumatic."

25.     Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals."  Bailey further states, "Back then you did not question a doctor's authority…He asked me to pull on his penis."

26.     Bailey filed a written complaint with the UM health service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

27.     No one from UHS or any other UM agency followed up with Mr. Bailey or contacted him as part of an investigation into Mr. Bailey's written sexual assault complaint.

28.     On information and belief, UM never acted on and/or investigated Bailey's complaint against Anderson.

29.     In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The complainant reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs (LARA).

30.     On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer. Yet, UM continued to employ Anderson until his voluntary retirement in 2003.

31.     **UM was warned again in 1975 by an undergraduate student athlete that Anderson was a sexual predator**. In 1975, UM's head wrestling coach, Bill Johannesen, admitted that whenever one of his wrestlers went to Anderson they had to "drop their drawers" even if the

injury was to the wrestler's elbow.

32.     In 1975, UM student and scholarship member of UM's wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a 10-page letter to his head wrestling coach, Bill Johannesen, complaining, among other things, that "Something was wrong with Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough" (emphasis added).

33.     Neither UM, Coach Johannesen, nor any agents of UM investigated Mr. Deluca's complaints about Anderson's sexual assaults; instead Coach Johannesen took away Deluca's athletic scholarship and kicked him off the wrestling team.

34.     Deluca appealed to then Athletic Director Don Canham and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

35.     Director Canham did not investigate the sexual abuse complaints against Anderson, and instead, upheld the revocation of Mr. Deluca's athletic scholarship.

36.     Mr. Deluca had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics to have his scholarship reinstated.

37.     **UM was warned again in 1979 by a graduate student that Anderson was a sexual predator**. According to records of the Washtenaw County Prosecutor's Office, around the same time period, a then-graduate student at the UM was seen by Anderson at the UHS when Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable…he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

38.     This graduate student complained loudly to the desk clerk, and then an administrator, both of whom "dismissed" him and ordered a security guard to escort him out of

6

UHS, instead of investigating his allegation against Anderson.

39.      **UM was warned again in 1979 by an UM activist that Anderson was a sexual predator preying on gay students**. In 1979, a local UM activist reported, among other things, to Tom Easthope, the-then Vice President of Student Life at UM, that Anderson had assaulted several members of the gay community at UM, as Easthope reported to the UM's Public Safety Department, Anderson was "fooling around with boys in the exam room."

40.      **UM acknowledged in 1979 that Anderson was a sexual predator**. Based on the information reported to him, Easthope decided to terminate Anderson but was nervous because Anderson was "big shot" at UM.

41.      Easthope confronted Anderson telling Anderson he knew Anderson was fooling around in the exam rooms with boy patients and Anderson did not deny Easthope's accusation.

42.      Easthope told Anderson, "You gotta go."

43.      After firing Anderson, Easthope decided to allow Anderson to resign to avoid an employee termination fight which would delay Anderson's leaving his job, and presumably, the UM.

44.      Neither Easthope nor his superiors or subordinates followed up to ensure that Anderson left the UM after his severance from UHS.

45.      This despite that when Easthope was recently confronted about Anderson, Easthope estimated "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

46.      According to UM human resource records, instead of terminating Anderson from the UM, UM "demoted" Anderson effective January 14, 1980 and moved him to the Athletic Department to be the primary care physician.

47.      Instead of termination, according to longtime UM athletic trainer Russell Miller,

7

Athletic Director Canham, a legendary and powerful figure at the UM, "worked out a deal" to bring Anderson over to the Athletic Department.

48.     Dana Mills, the then Administrative Manager at the UHS, said the "V.P.'s Office" would have been responsible for Anderson's transfer to the Athletic Department.

49.     Anderson was highly regarded as a university physician, especially by leaders in the Athletic Department, including a longtime UM athletic trainer who called Anderson an "unbelievable team doctor"; another UM athletic trainer who called Anderson "very incredible"; and one longtime coach of the UM football coaching staff during the 1980s, 1990s, and 2000s who called Anderson "a tremendous asset."

50.     Indeed, UM went so far as to overtly fraudulently conceal (with Anderson's assent) Anderson's predatory sexual conduct against college age males and intentionally conceal the reason for Anderson's termination/demotion, by praising Anderson in the published Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980.

51.     The UM outright lied in this publication by telling the public: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

52.     UM outright lied when it described Anderson's departure as voluntary and lauded his "leadership" when UM and its executives knew that (a) Easthope fired Anderson for his sexual assaults on male students, and (b) Anderson's termination  was changed to a written demotion in his human resources file, through the efforts of Athletic Director and other  "V.P.s", so Anderson

8

could go to the Athletic Department.

53.     After UM "demoted" the "big shot" Anderson to work full-time at the Athletic Department, Anderson had access to hundreds of male scholarship athletes, many from middle or working class families who could not afford to attend UM without an athletic scholarship, and were trained to unquestioningly endure  physical and emotional discomfort without complaining in order to get back on the ice, the wrestling mat or football field.

54.     The demotion gave Anderson free reign to abuse hundreds of male athletes like the Plaintiff with impunity.

55.     Anderson treated members of the wrestling, football, and hockey teams for every medical ailment, complaint, and injury as their UM-assigned internist. He served as their first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones.

56.     During his employment, agency, and representations with UM, Anderson sexually assaulted, abused and molested male student athletes by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

57.     Because UM took no action to investigate the complaints from students that began in 1968, and took no corrective actions even after Easthope attempted to fire Anderson in 1979, student-athletes were sexually assaulted, abused and molested by Anderson through nonconsensual digital anal penetration, and nonconsensual sexual touching of genitals.

58.     The students he abused did not understand (as UM did) the nature of the treatment Anderson administered, or rather that his putatively necessary medical treatment was not done to heal them but rather to satisfy Anderson's sexual desires.

59.     In particular, because so many were victimized, student athletes "normalized"

9

Anderson's abuse and accepted it as part of what they had to endure as an athlete already under intense, grueling training and physical demands, and they did not know that they were victims of assault at the time it occurred.

60.     Although uncomfortable with the treatments, the student athletes were led to believe by those in authority, including Athletic Director Canham, coaches and trainers, and Anderson, that the treatments were medically necessary or helpful.

61.     On July 18, 2018, UM alumnus, Tad Deluca, sent a letter to Warde Manual, UM Athletic Director, once again notifying Manual—as he did Don Canham in 1975— of Anderson's sexual assault while Deluca was a student between 1972 to 1976.

62.     On information and belief, UM then requested UM police to open an investigation, but UM did not take further action to notify former students and/or the public about the allegations and/or investigation until 19 months later.

63.     As UM President Schlissel admitted on February 20, 2020, "Our (UM) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

64.     At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan.

65.     At all times relevant, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or UM.

66.     At all relevant times, including the years 1968 to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

**V.     PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS**

67.     Plaintiff grew up in a blue-collar neighborhood with a large family.

10

68.     Plaintiff always wanted to be on the wrestling team at UM.

69.     Plaintiff's parents encouraged their son to attend UM on an athletic scholarship to wrestle, believing the coaches would take care of their son.

70.     Because Plaintiff was a part of a large blue-collar, working class family with many siblings, the only way Plaintiff could afford to attend a four-year college was through an athletic scholarship.

71.     When Plaintiff arrived on campus in the December 1987 on a wrestling scholarship, he saw Anderson for a physical exam which was required for participation with the wrestling program.

72.     At the time, he was a freshman, and was sexually assaulted for the first time by Anderson.

73.     The assaults, primarily nonconsensual and excessive genital fondling and manipulation – continued while he was an undergraduate student from 1987 to 1991.

74.     While Plaintiff attended UM and participated on the wrestling team as an undergraduate, he saw Anderson approximately 4 times a year (or 16 times over the course of his career) for physicals, various medical issues, neck injuries, knee injuries, strep throat, and common colds and flus.

75.     While Plaintiff was in the wrestling program, Anderson, called "Dr. A" by the wrestling coaches and trainers, and so the wrestlers as well, was his internist: he did not see any other internist while he was an UM student.

76.     Indeed, Anderson was the only internist Plaintiff was allowed to see as a student athlete on scholarship.

77.     And since UM was responsible for the medical care of its student athletes, Anderson's services were readily available to Plaintiff and free of charge.

11

78.     Plaintiff's head coach, assistant coaches, and trainers directed and required Plaintiff, and all other members of the wrestling team, to see Anderson for all their medical needs.

79.     It was further required and expected that all wrestlers not only see Anderson for any ailment but to unquestioningly follow his procedures and orders.

80.     And just as Plaintiff, as a high-performing student athlete, was used to following orders of coaches, whether it be regarding diet, exercise, training, and even academic performance, so too did Plaintiff fall in line when he was instructed to treat with Anderson – and no other primary physician – while he was a UM student.

81.     As the UM Athletic Department's physician and "gatekeeper," Anderson had the power to keep wrestlers off the wrestling mat under the guise of a diagnosis, and thus place Plaintiff's scholarship (and his opportunity for a college degree) in jeopardy if Plaintiff did not comply with Anderson's methods and orders.

82.     Since staying on the team and in competitions was critically important to Plaintiff and his teammates, they accepted the grueling physical conditions required to keep them there, including Anderson's uncomfortable treatments.

83.     During most of Plaintiff's appointments with Anderson during the four years he studied at UM, Anderson sexually assaulted, abused, and molested Plaintiff, by excessive and "too long" genital fondling.

84.     These assaults would occur when Plaintiff was seeing Dr. Anderson for complaints ranging from MCL and LCL knee injuries to neck injuries to strep throat and every time Dr. Anderson ordered Plaintiff to drop his pants and groped Anderson's genitals.  Not once did Plaintiff see Anderson for issues related to his genitals or anus.

85.     It was all excessive groping and it "was too long."

86.     Although the treatments made Plaintiff uncomfortable, Plaintiff was trained by his

12

rigorous wrestling training to do as he was ordered by those in positions of authority. Indeed, the physical and emotional rigors of wrestling require high tolerance to physical and emotional abuse.

87.     Plaintiff trusted his coaches and trainers who told him to see Anderson several times throughout the year, and so he trusted Anderson as his physician.

88.     Anderson assaulted and abused Plaintiff on at least 16 occasions between 1987 and 1991 on UM's campus.

89.     At the time of Anderson's treatments – not knowing (a) Anderson's acts were motivated by a criminal sexual intent and (b) that UM knew of Anderson's criminality yet intentionally and wantonly gave him access to sexually abuse male athletes like Plaintiff – Plaintiff trusted representations made to him that Anderson's actions, under the guise of medical treatment and in the confines of a medical examination room on UM's campus, were medically necessary and/or beneficial as treatment and/or diagnostic.

90.     When the abuse began, Plaintiff alone and away from home for the first time in his life, trusted Anderson as a medical professional and authority figure.

91.     At the time, Plaintiff had no medical training or experience, was not aware that Anderson's nonconsensual digital anal penetration and genital fondling, was not medical treatment, but instead was sexual assault, abuse, and molestation.

92.     Plaintiff believed Anderson's assaults were "normal, because it was happening to others."

93.     As UM President Schlissel has stated, "The patient-physician relationship involves a solemn commitment and trust."

94.     Because UM took no action to investigate complaints since 1968 nor to take corrective action to stop Anderson's abuse, and because UM knew of Anderson's sexual abuse of male students under the guise of medical treatment put him in a position to commit further acts of

13

criminal anal penetrations and genital groping of male college athletes between 1980 and 2003, UM knowingly placed Plaintiff in a position where he would likely be sexually abused.

95.    And because of UM's failure to act, despite knowledge that Anderson was preying on male college students under the guise of medical treatment, Plaintiff was in fact sexually assaulted, abused and molested by Anderson by nonconsensual digital anal penetration and nonconsensual sexual touching of the genitals.

96.    All the assaults could have been prevented if UM had acted on and/or investigated complaints against Anderson that UM had notice of as early as 1968.

97.    All of the assaults on Plaintiff could have been prevented if UM had terminated Anderson's employment in 1979 or 1980.

98.    All of the assaults on the Plaintiff could have been prevented if UM had warned the Plaintiff or properly supervised Anderson or trained Athletic Department supervisors such as Plaintiff's coaches and trainers. But UM failed to do any of these things that would have prevented Plaintiff's sexual abuse.

99.    Through Anderson's position with UM and his notoriety and respect in the UM community, particularly among high-ranking UM coaches and administrators, Anderson used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by UM.

100.    Plaintiff did not, and could not, consent to Anderson's purported treatments.

101.    All of Anderson's acts were conducted under the guise of providing medical care at his office at UM.

102.    The failure to give proper notice or to obtain consent from Plaintiff robbed him of the opportunity to reject Anderson's treatments.

## VI.    PLAINTIFF'S DAMAGES

103.    Plaintiff first learned Anderson was a serial sexual predator on February 19, 2020, when the news broke that several former students had come forward with stories of sexual abuse at the hands of Anderson under the guise of medical treatment while students at UM.

104.    The damages arise from two distinct and exclusive harms: (1) The revelation that Anderson's odd or weird acts, were not in fact, innocent odd or weird acts, but rather criminal sexual conduct motivated by Anderson's illegal sexual intent, and so Plaintiff is a sexual assault victim; and (2) the revelation that the UM – an integral part of Plaintiff's life and identity for the past 36 years – foisted a sexual predator on Plaintiff in the guise of a competent and concerned medical physician.

105.    Since this revelation, Plaintiff has been suffering shame, shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

106.    The news about Anderson has disturbed Plaintiff's innate sense of self-worth and self-identity, leading to anxiety and depression.

107.    Plaintiff has also suffered deeply, emotionally and psychologically, in ways that have manifested physically, from discovering on February 19, 2020, that his beloved alma mater knew about Anderson's sexual assaults for decades; yet did nothing to stop Anderson.

108.    Aside from these understandable injuries, other harms include (a) worries and anxiety that friends and family may find out that Plaintiff was a victim; (b) anxiety about future interactions with the UM; and (c) extreme anxiety about how these harms will manifest themselves in Plaintiff's middle age and senior years.

109.    Despite knowledge about Anderson's misconduct, UM knowingly kept him in positions where he had direct and intimate access to prey upon college athletes, such as Plaintiff,

from 1980 to 2003.

110.   These revelations have been traumatic and emotionally and psychologically damaging, forcing Plaintiff to relive the trauma of what he now knows to have been sexual assault.

111.   It has shattered Plaintiff psychologically and emotionally to learn the university he has spent his life being devoted to betrayed him and so many others by placing a sexual predator on staff where he had direct and unlimited access to young college students.

## VII.   FRAUDULENT CONCEALMENT

112.   The statute of limitations is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim" under M.C.L. § 600.5855.

113.   Both Anderson, and the Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, fraudulently concealed the existence of Plaintiff's claims by (1) concealing from Plaintiff that the uncomfortable procedures conducted during medical examinations were in fact sexual abuse, (2) concealing from Plaintiff that UM and its employees, agents, and representatives were aware of Anderson's sexual abuse and did nothing to stop it, (3) affirmatively telling Plaintiff the procedures were normal and/or necessary, (4) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, (5) concealing from Plaintiff that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity from Plaintiff as a "person who is liable for the claim," as set forth in more detail below.

### A.   Anderson's Fraudulent Concealment Imputed to UM.

114.   Anderson made affirmative representations to Plaintiff, referred to collectively as

16

"Anderson's representations," that:

    a.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, generally;

    b.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 24, with no reported issues related to genitals and/or anus;

    c.    Anderson's genital groping and anal penetrations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges;

    d.    Anderson was not sexually assaulting Plaintiff;

    e.    Plaintiff should not question and/or report the conduct to appropriate authorities;

    f.    Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, were aware of Anderson's treatments, that they still required Plaintiff to be subjected to it, and that they believed the treatments to be normal, necessary, proper, appropriate, legitimate, and/or medically beneficial; and

    g.    there was no possible cause of action against Anderson and/or UM.

115.    Anderson's representations were false. The UM Public Safety Department's recent investigation involving contact with medical professionals establishes that genital examinations or digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

116.    Anderson knew the representations were false. He conducted the sexual assaults for no reason other than for his own empowerment, sexual gratification, and/or pleasure. Anderson knew genital examinations and digital anal penetrations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist, particularly as the patients were young men (generally ages 17-24).

117.     Anderson's representations were material, in that had Plaintiff known the representations were false, Plaintiff would have stopped seeking treatment from Anderson immediately.

118.     Anderson's representations were made with the intent that Plaintiff would rely on them as Anderson sought to continue sexually assaulting Plaintiff, and others, evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiff, and others.

119.     Anderson's representations were also made with the intent of concealing from Plaintiff that he had a cause of action against Anderson and/or UM.

120.     Plaintiff did, in fact, rely on Anderson's representations; indeed, Anderson's representations led Plaintiff to continue seeking treatment from Anderson, and had he known Anderson's representations were false, Plaintiff would have stopped treating with Anderson.

121.     Anderson knew, and Plaintiff was in fact, particularly susceptible to believing Anderson's misrepresentations because:

    a.    Anderson's abuse continued while Plaintiff was a young and naïve adult;

    b.    Anderson's representations were made within the context of a pervasive culture created by statements made by representatives of UM, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

    c.    Plaintiff had no prior experience with legitimate and appropriately performed treatments that involve anal penetration, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed anal penetration from a sexual assault;

    d.    Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that Anderson's treatments were sexual assaults, and this concealment from other adults deprived them of the opportunity to inform Plaintiff that he had been sexually assaulted and had a cause of action;

    e.    Based on Neuroscience, the prefrontal cortex of the brain, which we use to

make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

f.    Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.    Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.    Plaintiff trusted Anderson due to his notoriety and reputation;

i.    Plaintiff was compelled by Anderson to undergo genital and anal examinations like other athletes and not question them if he wanted to keep his scholarship, stay on the team, and remain at UM to earn his college degree;

j.    Plaintiff had no reason to believe or be aware that he could possibly sue or had a possible cause of action because he was a young adult, who was not knowledgeable or aware of the civil justice system and applicable remedies at law;

k.    Plaintiff had no reason to believe or be aware that he could possibly sue or had a possible cause of action when he was not aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations from students and the public in general and since the culture of the Athletic Department normalized Anderson's treatments;

l.    Plaintiff had never previously heard about allegations in the media regarding sexual assaults or misconduct by Anderson, indeed there was none; and

m.    Plaintiff was never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from parents and others.

122.    Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Anderson and/or UM until he read an article on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiff became aware he was the victim of sexual assault and that UM indirectly or directly caused the abuse by being aware

Anderson was a sexual predator and failing to stop Anderson from harming students.

123.    Anderson also breached a fiduciary duty to Plaintiff, and so his failure to disclose material information was fraudulent.

124.    Anderson further concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry, so he and Defendants escape investigation, in that he:

      a.    prevented other medical professionals, coaches, trainers, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff while he sexually assaulted Plaintiff; and

      b.    did not abide by or follow the standard and care which requires another medical professional, coach, trainer, parent, guardian, and/or caregiver be in the room during the examination and treatment of minor patients.

125.    Anderson's representations caused Plaintiff's injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiff's beloved alma mater that he devoted his life to, in many respects, betrayed him by placing him in the care of a known sexual predator.

126.    Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

127.    Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so he and Defendants escape investigation.

128.    At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of UM and operated within the scope of his employment, and his negligence is imputed to UM.

129.    At all times material here, Plaintiff was free of any negligence contributing to the injuries and damages alleged.

B.    **Defendants' Fraudulent Concealment.**

130.    Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives, and members of UM's administration, made affirmative representations to Plaintiff, referred to collectively as "Defendants' representations," that:

a.    Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980;

b.    Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual Report to him" even though UM and its executives knew that Easthope had fired Anderson for his inappropriate sexual conduct toward male students;

c.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, generally;

d.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 24, with no reported issues related to genitals and/or anus;

e.    Plaintiff was required to be subjected to Anderson's treatments as they were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

f.    Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

g.    Anderson's genital groping and anal penetrations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and

21

psychological stress and challenges;

    h.    Anderson was not sexually assaulting Plaintiff;

    i.    Plaintiff should not question and/or report the conduct to appropriate authorities; and

    j.    there was no possible cause of action against Anderson and/or UM.

131.   Defendants' representations were false. The UM's Public Safety Department's recent investigation involving contact with medical professionals establishes that genital examinations or digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

132.   Defendants knew the representations were false. Defendants received several complaints about Anderson's sexual assaults prior to Plaintiff arriving on campus. Indeed, Defendants removed Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating UM's knowledge the representations were false.

133.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital and anal examinations had been questioned in the past.

134.   Defendants' representations were material, in that had Plaintiff known the representations were false, he would have stopped seeking treatment from Anderson immediately.

135.   Defendants' representations were made with the intent that Plaintiff would rely on them as UM sought to prevent Plaintiff from discovering he had a cause of action against Anderson and/or UM.

136.   Plaintiff did, in fact, rely on Defendants' representations; indeed, the

representations led Plaintiff to continue seeking treatment from Anderson, and had he known the

representations were false, Plaintiff would have stopped treating with Anderson.

137.    Defendants concealed the fraud by affirmative acts that were designed and/or

planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in

that they:

      a.    Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

      b.    Affirmatively lied in written publications about Anderson "resigning" from UHS when he was fired, and then retained but demoted him, for assaults on male students;

      c.    Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal examinations; and

      d.    Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers be present during an examination of a minor by a physician.

138.    Defendants knew, and Plaintiff was in fact, particularly susceptible to believing

Defendants' representations because:

      a.    Anderson's abuse occurred while Plaintiff was a young and naïve adult;

      b.    Defendants' representations were made within the context of a pervasive culture created by statements made by UM representatives, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

      c.    Plaintiff had no prior experience with legitimate and appropriately performed treatments that involve anal penetration, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed anal penetration from a sexual assault;

      d.    Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that his genital and anal examinations were sexual assaults and inform Plaintiff that he had been sexually assaulted and had a cause of

action;

e.    Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

f.    Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.    Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.    Plaintiff trusted Anderson due to his notoriety and reputation;

i.    Plaintiff was compelled by Anderson to undergo genital and anal examinations like other athletes and not question them if he wanted to keep his scholarship, stay on the team, and remain at UM to earn his college degree;

j.    Plaintiff had no reason to believe or be aware that he could possibly sue or had a possible cause of action because he was a young adult, who was not knowledgeable or aware of the civil justice system and applicable remedies at law;

k.    Plaintiff had no reason to believe or be aware that he could possibly sue or had a possible cause of action when he was not aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations and since the culture of the Athletic Department normalized Anderson's treatments;

l.    Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

m.    Plaintiff was never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others.

139.    Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Anderson and/or Defendants until he read an article on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiff became aware he was the victim of sexual assault and that Defendants indirectly or directly caused the abuse by

being aware Anderson was a sexual predator and failing to stop him from harming students.

140.    In addition to affirmative false representations, UM coaches, officials, agents, and representatives failed to disclose to Plaintiff that he was being sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

141.    Because UM had a fiduciary duty to Plaintiff, the failure to disclose material information is also fraudulent.

142.    At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

143.    Defendants' representations caused Plaintiff's injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiff's beloved alma mater that he devoted his life to, in many respects, betrayed him by placing him in the care of a known sexual predator.

144.    Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

145.    Defendants committed Fraudulent Concealment, as described in detail above and below.

## COUNT I:
## VIOLATION OF TITLE IX, 20 U.S.C. §1681(A), ET SEQ.[1]

146.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

147.    Title IX's statutory language states, "No person in the United States shall on the basis of sex, be ... subject to discrimination under any education program or activity receiving Federal financial assistance ..."

148.    Plaintiff is a "person" under the Title IX statutory language.

149.    UM receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX (of the Education Act of 1972, 20 U.S.C. §1681(a), et seq.

150.    UM is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

151.    The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

152.    Anderson's actions and conduct were carried out under one of UM programs, which provides medical treatment to students, athletes, and the public.

153.    Anderson's conduct and actions toward Plaintiff, that being nonconsensual genital manipulation and digital anal penetration, constitutes sex discrimination under Title IX.

154.    As early as 1968, an "appropriate person" at UM had actual knowledge of the sexual assault, abuse, and molestation of young men committed by Anderson.

---

[1] Plaintiff outlines his damages, which is needed for many of the following counts, in general allegations at the end of the counts section below, and those general damage allegations are incorporated by reference into all applicable counts to avoid excessive redundancy and for ease of reading by the Court.

155.    Specifically, Defendants were notified about Anderson's sexual abuse and molestation by young male students in or around 1968, 1975, 1979, and, on information and belief, on many other occasions before and after 1980.

156.    Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1968.

157.    After the 1968, 1975, and 1979 complaints, Anderson continued to sexually assault, abuse, and molest young male students, and later exclusively male athletes, including but not limited to Plaintiff.

158.    Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

    a.    Failing to investigate and address other victim's allegations as required by Title IX;

    b.    Failing to adequately investigate and address the complaints regarding Anderson's conduct; and,

    c.    Failing to institute corrective measures to prevent Anderson from violating and sexually abusing other students and individuals, including minors.

159.    Defendants acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

160.    Defendants' responses were clearly unreasonable as Anderson continued to sexually assault athletes and other individuals and Plaintiff until he retired from UM in 2003.

161.    Between the dates of approximately 1968-2003, Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Anderson's sexual assaults and sex-based harassment of young male students, and later young male student

27

athletes, on and off school premises.

162.    Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff to further harassment and a sexually hostile environment, effectively denying his access to educational opportunities at UM, including medical care.

<u>**COUNT II:**</u>
<u>**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – STATE CREATED**</u>
<u>**DANGER**</u>

163.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

164.    The due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law.

165.    Defendants deliberately exposed Plaintiff to a dangerous sexual predator, Anderson, knowing Anderson could and would cause serious damage by sexually assaulting male students, especially male student athletes, on campus.

166.    This conduct was culpable in the extreme.

167.    Plaintiff was a foreseeable victim of Defendants' decision to make Anderson the physician to the UM Athletic Department.

168.    Plaintiff's sexual assault was foreseeable and fairly direct.

169.    The decisions and actions to deprive Plaintiff of a safe campus constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiff.

170.    Defendants acted in willful disregard for the safety of Plaintiff.

171.    Defendants have a fiduciary duty to protect students, like Plaintiff, from harm; and Defendants breached that duty by allowing Plaintiff's sexual assault by placing student athletes in

the care of a known sexual predator.

172.     Defendants created the opportunity for Anderson to sexually assault Plaintiff that he would not otherwise have had the opportunity to do but for Defendants giving Anderson the job as Athletic Department physician when it was known to Defendants that he was a sexual predator.

173.     At all relevant times, Defendants and Anderson (as Defendants' agent) were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

**COUNT III:**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY**

174.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

175.     The due process clause of the 14th Amendment includes an implied right to bodily integrity.

176.     Plaintiff enjoys the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

177.     At all relevant times, Defendants UM, UM Regents, and Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

178.     The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

179.     As a matter of custom, policy, and and/or practice, Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and

representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

180.    Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

181.    Defendants' failure to address these patients' complaints led to an unknown number of individuals (aside from the Plaintiff) being victimized, sexually assaulted, abused, and molested by Anderson.

182.    Additionally, Defendants' failure to properly address the 1968, 1975, 1979, and other complaints regarding Anderson's sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Anderson.  Indeed, all that UM needed to do was fire Anderson in 1979.

183.    Ultimately, Defendants failed to adequately and properly investigate the complaints of Plaintiff or other similarly situated individuals including but not limited to failing to:

   a.    Not foist Anderson on the population of wrestling, football, and hockey scholarship male athletes, who were accustomed to physical and emotional discomfort, and because they needed the scholarships, would be less likely to complain about Anderson's conduct;

   b.    Perform a thorough investigation into improper conduct by Anderson after receiving complaints; and

   c.    Thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Anderson.

184.    By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Anderson's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to Plaintiff pursuant to 42 U.S.C. §1983.

185.     Defendants are also liable to Plaintiff under 42 U.S.C. §1983 for maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983

186.     Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Anderson, with the result that Anderson was allowed to violate the rights of persons such as Plaintiff with impunity.

<u>**COUNT IV:**</u>
<u>**FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983**</u>

187.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

188.     Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Anderson and all faculty and staff regarding their duties toward students, faculty, staff and visitors.

189.     Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

a.     Perceive, report, and stop inappropriate sexual conduct on campus;

b.     Provide diligent supervision over student-athletes and other individuals, including Anderson;

c.     Report suspected incidents of sexual abuse or sexual assault;

d.     Ensure the safety of all students, faculty, staff, and visitors to UM's campuses premises;

e.     Provide a safe environment for all students, faculty, staff, and visitors to UM's premises free from sexual harassment; and,

f.     Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

g.     The above list of duties is not exhaustive.

190.    Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights.

191.    Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of student-athletes.

192.    Defendants' failure to adequately train is closely related to or actually caused Plaintiff's injuries.

193.    As a result, Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

<u>COUNT V:</u>
<u>VIOLATION OF THE ELLIOTT-LARSEN ACT, M.C.L. § 37.2201 ET. SEQ. (SEX DISCRIMINATION)</u>

194.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

195.    UM is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (ELCRA).

196.    Anderson was a "person" as that term is defined in the ELCRA and was an agent of UM.

197.    Plaintiff's sex was at least one substantial factor motivating Anderson to select Plaintiff as a victim of his sexual assault.

198.    Had Plaintiff been a female, he would not have been targeted as a victim by Anderson.

199.    By giving Anderson access to Plaintiff, as his treating physician on UM's campus, Defendants, through agents, representatives, and employees, including Anderson were predisposed to discriminate on the basis of Plaintiff's sex and acted in accordance with that

predisposition.

200.     By giving Anderson access to Plaintiff, as his treating physician on UM's campus, Defendants, through agents, representatives, and employees, including Anderson, treated Plaintiff differently from similarly situated female students who UM did not give Anderson access to in the same way as it freely gave Anderson access to Plaintiff and hundreds of other male students, based on unlawful consideration of sex.

201.     Defendants violated the ELCRA and deprived Plaintiff of his civil rights by, among other things, subjecting Plaintiff, because of his sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiff the full benefit of the educational program of UM and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

### COUNT VI:
### VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

202.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

203.     The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law. . . ." Const 1963, art 1, § 17.

204.     The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects unenumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment and Const 1963, art 1, § 17.

205.     The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference.

33

206.     In a long line of cases, courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity.

207.     The right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process and Const 1963, art 1, § 17.

208.     The violation of the right to bodily integrity involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.

209.     The United States Supreme Court and the Michigan appellate courts have recognized that no right is held more sacred, or is more carefully guarded, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

210.     The violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

211.     Defendants' official policies, customs and practices violated include:

   a.     Failing to supervise, train and educate Anderson, Anderson's managers and/or Anderson's patients or their parents so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

   b.     Actively concealing Anderson's abhorrent behavior; and

   c.     Purposefully placing Anderson in the position as Athletic Department physician, despite knowing he sexually preyed on male students under the guise of medical treatment, further enabling Anderson to have unfettered sexual access to more students.

212.     Defendants' policies, customs and practices of permitting, condoning and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed students to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

34

213.    The decisions which resulted in Defendants' violating Plaintiff's constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

## COUNT VII:
## VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER

214.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

215.    Plaintiff enjoyed a substantive due process right under the Michigan Constitution to avoid the risk of harm or danger created or increased by an affirmative act of the state.

216.    This right is violated when the state (1) engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party; (2) placed a plaintiff in a special danger, as distinguished from a risk that affects the public at large; and, (3) knew or should have known that its actions specifically endangered the plaintiff.

217.    The state's (UM's) affirmative acts consisted of (1) permitting, condoning and reassigning Anderson so that he could have sexual access to male student-athletes under the guise of medical treatment and then (2) concealing its knowledge that Anderson, by virtue of state policy, practice or custom was permitted to carry out his unlawful and abhorrent behavior.

218.    These affirmative acts created or increased the risk that Plaintiff would be exposed to an act of violence or sexual assault by Anderson.

219.    The Defendants' conduct created a special danger to Plaintiff and others like him because the state's (UM's) actions specifically put this discrete group – male athletes, most of whom cannot complain about "medical treatment" or risk the scholarships that provided them the only opportunity at a college education – at increased risk in that the state knew that Anderson was taking advantage of the sacred patient-physician relationship in order to carry out his violence against Plaintiff and other members of the same discrete group.

35

220.    Defendants knew or should have known that its affirmative acts specifically endangered Plaintiff.

221.    Defendants established official policies, customs and practices, which permitted, condoned and actually promoted Anderson's access to male athlete victims so that he could both excessively grope and manipulate their genitals and digitally penetrate their anuses, while they sought medical treatment from him.

222.    The decisions resulting in Defendants' violation of Plaintiff's constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

223.    Defendants' official policies, customs and practices violated Plaintiff's rights, and included, among other things, each of the below acts, which each independently violated Plaintiff's rights:

   a.    Failing to supervise, train and educate Anderson, Anderson's managers or Anderson's patients or their parents (in the case of victims who were minors at the time of the assaults) so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

   b.    Actively concealing Anderson's abhorrent behavior;

   c.    Purposefully placing Anderson in the position as Athletic Department physician, despite knowing he sexually preyed on students under the guise of medical treatment, further enabling Anderson to have unfettered sexual access to more students; and

   d.    Not terminating Anderson.

224.    Defendants' policies, customs and practices of permitting, condoning and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed them to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

## COUNT VIII:
## GROSS NEGLIGENCE

225.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

226.    Defendants owed Plaintiff a duty to use due care to ensure his safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Anderson.

227.    Anderson owed Plaintiff a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of Defendants.

228.    By seeking medical treatment from Anderson in the course of his employment, agency, and/or representation of Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Anderson was created, resulting in Anderson owing Plaintiff a duty to use due care.

229.    Defendants' failure to adequately supervise Anderson, especially after UM knew or should have known of complaints regarding his nonconsensual sexual touching and sexual penetrations during genital and anal examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

230.    Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of Defendants and under the guise of rendering medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

231.    Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

232.    Defendants' conduct as described above, demonstrated a willful disregard for

substantial risks to Plaintiff.

233.    Defendants breached duties owed to Plaintiff and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiff's health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

## COUNT IX:
## NEGLIGENCE

234.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

235.    Defendants owed Plaintiff a duty of ordinary care to ensure his safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

236.    By seeking medical treatment from Anderson in his capacity as an employee, agent, and/or representative of Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Anderson was created, resulting in Anderson owing Plaintiff a duty to use ordinary care.

237.    Anderson owed Plaintiff a duty of ordinary care.

238.    Defendants' failure to adequately train and supervise Anderson breached the duty of ordinary care.

239.    Defendants had notice through its own employees, agents, and/or representatives as early as 1968, and again in 1975 and 1979, of complaints of a sexual nature related to Anderson's predatory and criminal sexual genital and anal examinations of young male students.

240.    Defendants should have known of the foreseeability of Defendants' sexual abuse of male UM athletes, from 1968 onward.

241.    Defendants' failure to properly investigate, address, and remedy complaints regarding Anderson's conduct was a breach of ordinary care.

242.    Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of Defendants was a breach of the duty to use ordinary care.

## COUNT X:
## VICARIOUS LIABILITY

243.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

244.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

245.    Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

246.    Defendants employed and/or held Anderson out to be their agent and/or representative from approximately 1968-2003.

247.    Defendants had the right to supervise Anderson's medical exams, indeed had a duty to supervise Anderson.

248.    Defendants had an obvious and direct financial interest in allowing Anderson to continue rendering medical care for the Athletic Department as Defendants financially gain from the operations of its Athletic Department.

249.    Defendants are vicariously liable for the actions of Anderson as described above that were performed during the course of his employment, representation, and/or agency with Defendants and while he had unfettered access to young athletes on UM's campus.

## COUNT XI:
## EXPRESS/IMPLIED AGENCY

250.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

251.    An agent is a person who is authorized by another to act on its behalf.

252.    Defendants intentionally or negligently made representations that Anderson was their employee, agent, and/or representative.

253.    On the basis of those representations, Plaintiff reasonably believed that Anderson was acting as an employee, agent, and/or representative of Defendants.

254.    Defendants had the right to control the conduct of Anderson.

255.    Anderson had the right and authority to represent or bind Defendants.

256.    Plaintiff was injured as a result of Anderson's predatory sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency, and/or representation with Defendants and while he had unfettered access to young male athletes.

257.    Plaintiff was injured because he relied on Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

## COUNT XII:
## NEGLIGENT SUPERVISION

258.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

259.    Defendants had a duty to provide reasonable supervision of their employee, agent and/or representative, Anderson, while he was in the course of his employment, agency or representation with Defendants and while he interacted with young athletes including Plaintiff.

260.    It was reasonably foreseeable given UM's knowledge that Anderson was a sexual

40

predator of young college male students at the time UM first fired, then reinstated, and then demoted Anderson in 1980.[2]

261.     Defendants by and through their employees, agents, managers and/or assigns, knew or reasonably should have known of Anderson's conduct and/or that Anderson was an unfit employee, agent, and/or representative because of his sexual interest in male students.

262.     Defendants breached their duty to provide reasonable supervision of Anderson, and permitted Anderson, who was in a position of trust and authority, to commit the acts against Plaintiff.

263.     The aforementioned sexual abuse occurred while Plaintiff and Anderson were on the premises of UM, and while Anderson was acting in the course of his employment, agency, and/or representation of Defendants.

264.     Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Anderson was allowed to violate the rights of persons such as Plaintiff with impunity.

## COUNT XIII:
## NEGLIGENT FAILURE TO WARN OR PROTECT

265.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

266.     Defendants knew or should have known that Anderson posed a risk of harm to Plaintiff or those in Plaintiff's situation.

267.     As early as 1968, Defendants had direct and/or constructive knowledge as to the

---

[2] The firing occurred in 1979 but was intended to be effective in 1980.

dangerous conduct of Anderson and failed to act reasonably and responsibly in response.

268.    Defendants knew or should have known Anderson committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

269.    Defendants had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by Anderson.

270.    The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Anderson as an employee, agent, and or representative of Defendants and Plaintiff.

271.    Defendants breached said duty by failing to warn Plaintiff and/or by failing to take reasonable steps to protect Plaintiff from Anderson.

272.    In addition to affirmatively requiring Plaintiff to be treated, and thus subject to inappropriate genital manipulations and digital anal penetrations, where UM was aware of Anderson's prior sexual assaults, Defendants breached its duties to protect Plaintiff by failing to:

  a. Respond to allegations of sexual assault, abuse, and molestation;

  b. Act on evidence of sexual assault, abuse, and molestation; and,

  c. Investigate, adjudicate, and terminate Anderson's employment with UM prior to his treatment of Plaintiff between 1984 and 1989.

273.    Defendants failed to adequately screen, counsel and/or discipline Anderson for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in violations of Plaintiff's rights.

274.    Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Anderson's conduct.

## COUNT XIV:
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

275.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

276.    Defendants breached their duty to take reasonable protective measures to protect Plaintiff and other young adults from the risk of sexual assault by Anderson, such as the failure to properly train or educate Plaintiff and other individuals (including minors) about how to avoid such a risk.

277.    Defendants failed to, among other things, implement reasonable safeguards to:

   a.    Prevent acts of sexual assault;

   b.    Avoid placing Anderson in positions where he would be in unsupervised contact and interaction with Plaintiff and other young athletes;

   c.    Educate athletes such as Plaintiff on reporting and/or preventing unwanted touchings from authority figures, especially given UM's knowledge it was putting a predator such as Anderson in contact with young male athletes; and

   d.    Training or educating coaches and trainers to be aware of improper touchings, especially given UM's knowledge it was putting a predator such as Anderson in contact with young male athletes.

## COUNT XV:
## NEGLIGENT RETENTION

278.    Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

279.    Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

280.    Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative in their failure to adequately investigate, report and address complaints about

his conduct of which they knew or should have known.

281.   If Defendants had not retained Anderson, and instead fired him, Plaintiff's injuries would not have occurred.

282.   Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative when after they discovered, or reasonably should have discovered, Anderson's conduct which reflected a propensity for sexual misconduct.

283.   Defendants' failure to act in accordance with the standard of care resulted in Anderson gaining access to and sexually abusing and/or sexually assaulting Plaintiff and an unknown number of other individuals.

284.   The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Anderson created a foreseeable risk of harm to Plaintiff as well as other young adults.

**COUNT XVI:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

285.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

286.   Defendants allowed Anderson to be in a position where he could sexually assault, abuse, and molest minors and young adults. Defendants' actions were extreme and outrageous.

287.   A reasonable person would not expect Defendants to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew of complaints and claims of sexual assault and abuse occurring during Anderson's genital examinations.

288.   Defendants held Anderson in high esteem and acclaim which in turn encouraged Plaintiff and others to respect and trust Anderson and to not question his methods or motives.

289.   A reasonable person would not expect Defendants to be incapable of supervising

Anderson and/or preventing Anderson from committing acts of sexual assault, abuse, and molestation.

290.     Defendants' intentional and/or reckless conduct as described above caused Plaintiff severe emotional distress.

## COUNT XVII:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

291.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

292.     By allowing Anderson to be in a position where he could sexually assault, abuse, and molest minors and young adults, Defendants were negligent.

293.     Defendants' negligence proximately caused Plaintiff to be sexually assaulted by Anderson.

294.     Plaintiff has suffered severe damages related to the sexual assault as well as from discovering he was a victim of sexual assault caused by the actions of his beloved alma mater.

295.     Events caused by Defendants, Anderson's sexual assault of Plaintiff, naturally and probably resulted in emotional distress.

296.     Events caused by Defendants, Anderson's sexual assault of Plaintiff, did in fact result in emotional distress.

## COUNT XVIII:
## FRAUD AND MISREPRESENTATION

297.     Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

298.     From approximately 1968-2003, Defendants represented to Plaintiff and the public that Anderson was a competent and safe physician.

299.     By representing that Anderson was a team physician and athletic physician at UM,

Defendants represented to Plaintiff and the public that Anderson was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Anderson.

300.    The representations were false when they were made as Anderson had and was continuing to sexually assault, abuse, and molest Plaintiff and an unknown number of other individuals.

301.    Between 1968 and 1979, Defendants received numerous complaints about Anderson's sexual assaults of male patients in the guise of genital and anal examinations, yet misrepresented his moving from UHS to the Athletic Department, as a "resignation" in oral and written representations to the UM community and public at large, when they knew Anderson was first fired, then reinstated with a demotion, as a result of his sexually predatory conduct toward college age males like Plaintiff.

302.    Although UM was informed of Anderson's conduct they failed to investigate, remedy, or in any way address the patients' complaints.

303.    Defendants continued to hold Anderson out as a competent and safe physician.

304.    Defendants made such misrepresentations intending Plaintiff and others similarly situated to rely on them.

305.    Plaintiff relied on the assertions of Defendants and continued to seek treatment from Anderson in the wake of concerns and dangers known only to Defendants.

306.    Plaintiff was subjected to sexual assault, abuse, and molestation as a result of Defendants' fraudulent misrepresentations regarding Anderson.

## DAMAGES FOR ALL CAUSES OF ACTION, COUNTS I-XVIII

307.    As a direct and/or proximate result of Defendants' conduct, Plaintiff suffered and suffers discomfort, pain of mind and body, shock, emotional distress, physical manifestations of

46

emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and such other injuries and physical manifestations as may appear during the course of discovery and trial in this matter.

308.    These irreparable harms Plaintiff suffers, and will continue suffering, are proven damages typically suffered by young men when sexually assaulted by another man who is a trusted person and/or medical provider.

309.    Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression. See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).

310.    Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim. See *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1): 21-46); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

311.    When sexual abuse is perpetrated by a medical provider, patients often lack the ability to comprehend the abuse due to the provider's position of access, trust and authority and commonly suffer from emotional distress, humiliation, and and the inability to trust medical care providers or the medical care professional generally. See *Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2-abuse-of-power.htm.

312.     In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiff has and continues to suffer irreparable harm as a result of the violations.

**WHEREFORE,** Plaintiff requests this Court and the finder of fact to enter a Judgment in Plaintiff's favor against Defendants on all counts and claims above in an amount consistent with the proofs of trial, and seeks an award against Defendants for all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable, including but not limited to:

a.     Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b.     Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

c.     Reasonable attorney fees, interest, and costs; and,

d.     Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorneys for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Telephone: (734) 591-4002

Dated: March 5, 2020

Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
david.shea@sadplaw.com

Dated: March 5, 2020

## JURY DEMAND

Plaintiff, by and through his attorneys, Michael A. Cox, Jackie Cook and The Mike Cox Law Firm, PLLC, as well as David J. Shea and Shea Law Firm PLLC, hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorney for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Telephone: (734) 591-4002

Dated: March 5, 2020

Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
david.shea@sadplaw.com

Dated: March 5, 2020

49